| | | |
|---|---|---|
| **GARY R. PRINCE REVOCABLE TRUST,** | ) | |
| **GARY R. PRINCE TRUSTEE, GARY** | ) | |
| **PRINCE, CHRISTOPHER CAMPBELL,** | ) | |
| **WILLIAM  LISTON and wife DIANA L.** | ) | |
| **LISTON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-0475** |
| | ) | **Judge Wiseman** |
| **CHRIS BLACKWELL PERSONALLY and** | ) | |
| **D/B/A BLACKWELL CONSTRUCTION,** | ) | |
| **WILLIAM BLACKWELL and DBS &** | ) | |
| **ASSOCIATES OF CLARKSVILLE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This is a diversity action involving alleged water damage to several multi-unit residential complexes.  Pending before the Court is a Motion for Partial Summary Judgment filed by Plaintiffs Gary R. Prince Revocable Trust, Gary R. Prince Trustee, Gary Prince, Christopher Campbell, William Liston and Diana L. Liston  (Docket Entry No. 29).  Also pending are separate Motions for Summary Judgments filed by Defendant DBS & Associates of Clarksville, Inc. ("DBS") (Docket Entry No. 37) and Defendants Chris Blackwell, personally and d/b/a Blackwell Construction, and William Blackwell ("the Blackwell Defendants") (Docket Entry Nos. 45).  Those Motions will be discussed under separate headings after a review of the general facts common to all motions.  The facts will be expanded upon where necessary for purposes of the legal discussion.

## I.  FACTUAL BACKGROUND

1

This case arises out of the design and construction of four apartment complexes in Montgomery County, Tennessee, all of which were purchased by Plaintiffs. The properties are located on Tower Drive, Stephanie Drive, Ringgold Court, and Cory Drive.

All of the properties were constructed in 2006 and early 2007 by Defendant Blackwell Construction, which is a general partnership owned by Defendants Chris Blackwell and William Blackwell. DBS provided civil site design and engineering services for the properties located on Ringgold Court, Stephanie Drive, and Cory Drive.

When Plaintiffs purchased the Tower Drive property, it was already completed and had some tenants residing therein. The remaining properties were built pursuant to Purchase and Sale Agreements ("Purchase Agreements") between Plaintiffs and the Blackwell Defendants.

With respect to each of the properties, Prince acted as an agent for the remaining Plaintiffs and only he communicated directly with Chris and William Blackwell. Prince claims that Chris Blackwell wrongly informed him that he was a licensed contractor, although the date of that representation is disputed.

The licensing issue was only briefly touched upon in Prince's deposition and, at the time, Prince stated he "was pretty sure" there was some discussion about Chris Blackwell being a contractor, but he did not remember the details of the conversation (Prince Depo. at 39-40). In a Declaration filed in support of Plaintiff's Motion for Summary Judgment, Prince states that Chris Blackwell told him he was a licensed contractor after the purchase of the Tower Drive property, "but prior to arranging or the closing of the sales of the other properties[.]" (Prince Decl. ¶¶ 7-8). For his part, Chris Blackwell admitted in his deposition that he told Prince he had a contractor's license, although he does not recall when the conversation took place. (Chris Blackwell Depo. at 24).

2

Regardless, neither Chris nor William Blackwell were licensed contractors at the time any of the subject properties were built, and Plaintiffs learned through a July 7, 2008 e-mail to their property manager that Chris Blackwell was probably not a licensed contractor. (Docket Entry No. 41-13). Both Defendant Chris and William Blackwell received Tennessee contractor's licenses after the units at issue were built.

Under the Purchase Agreements, Plaintiffs had the right and responsibility to inspect the properties for "structural defects, interior water intrusion(s), standing water within foundation and/or basement, and the roof and decking for visible leaks." (Docket Entry No. 1, Ex. A ¶ 8B). The Purchase Agreements also provided that "[i]n the event Buyer fails to timely make any inspection, the Buyer shall have forfeited any rights provided under this Section [entitled Inspections], and in such case shall accept the Property in its current condition normal wear and tear excepted." (Id. ¶ 8A). The Purchase Agreements further stated that Plaintiffs had the right to a Final Inspection of the properties one day before closing and that "[c]losing of this sale constitutes acceptance of the Property unless otherwise noted in writing." (Id. ¶ 8D).

Plaintiffs had the opportunity to inspect all of the properties and did, in fact, inspect at least both the Cory Drive and Stephanie Drive properties prior to closing. Prince inspected those properties, as did Plaintiffs' realtor, and Ed Hadley ("Hadley"), a home inspector. Prince noticed some cut trees which were stacked on the Cory Drive property and, at his request, the trees were removed. Hadley developed a "punch list" of items that needed to be fixed on the properties and those items were corrected.

Sometime after the units were completed and Plaintiffs obtained ownership and possession, Plaintiffs and/or their tenants began complaining about water entry on the properties. Plaintiffs

3

claim that improper drainage, defective site grading, and improper or defective construction have lead to significant water damage, even after moderate rains. Plaintiffs allege that the water intrusion includes not only the foundation of the apartments and surrounding land, but also significant intrusion into the ground floor apartments on some of the properties. This is most acute with respect to the Cory Drive property, while the Stephanie Drive property has some localized flooding issues, and the Tower Drive property has some issues with siltation forming in the drives and parking areas.[1]

Plaintiffs first contacted Chris Blackwell regarding flooding at the Cory Drive property approximately six or seven months after Plaintiffs became owners of the property. He went to the property and found a swimming pool lodged in the drainage ditch, damming the ditch and resulting in water entry onto the property. On another occasion, Chris Blackwell found down spouts laying in the parking lot, which had been presumably removed by the property management company to place shutters on the units at the Cory Drive property. He also found that splash guards had been removed from the down spouts. On still another occasion, Chris Blackwell found that tenants had placed a large trampoline in a drainage ditch which resulted in blockage.

In 2008, Plaintiffs hired Ed Neely ("Neely"), a professional engineer, to inspect the properties for potential water problems. Neely and Prince met with Chris Fielder ("Fielder") of DBS to discuss water issues at the Cory Drive property. Thereafter, in 2008, DBS and the Blackwell Defendants redesigned the slope of the property in an effort to fix the water issues and installed a $20,000 drainage system and overflow pipe. Additionally, with the permission of the City of

---

[1]The summary judgment record does not make clear the nature of any problems at the Ringgold Court property, although, as with all of the properties, questions exist as to its value in light of the fact that it was built by an unlicensed contractor.

4

Clarksville, the Blackwell Defendants moved a pond on an adjoining piece of property. They also re-sodded the grass and watered it for a period of two weeks, after which it became Plaintiffs' responsibility to water.

At some point after the units had been turned over to Plaintiffs and complaints had been made about water problems, Chris Blackwell discovered that the Cory Drive property was not built in accordance with the elevations specified by DBS. DBS signed an "as-built" certification in April 2007, which, according to Neely, meant that DBS was satisfied "that the grading and drainage modifications intended by [its] original plan had been satisfied." (Neely Depo. at 79).

As indicated, DBS performed site design services for the units being constructed by Blackwell Construction on Ringgold Court, Stephanie Drive, and Cory Drive and those services were pursuant to a contract with the Blackwell Defendants. Plaintiffs concede that DBS performed its design services relating to both the Ringgold Court and the Stephanie Drive properties in accordance with the applicable standard of care.

As for the Cory Drive property, DBS performed design services on two separate occasions. It prepared the original site grading and drainage plan for the Cory Drive property and claims that, in doing so, it performed hydraulic calculations that considered the effects of the pond on the adjacent piece of property. DBS also provided design services relating to improvements to the pond on the property adjacent to the Cory Drive property. As part of that design, DBS specified that a spillway needed to be added to the pond and the Blackwell Defendants added such a spillway.

Neely, who was hired to inspect the properties, has been retained by Plaintiffs as their expert in this case. He issued his expert report on March 12, 2010. Neely's expert report does not address the Ringgold Drive property and during his deposition he testified that he did not recall hearing any

5

problems about the Ringgold property. Because of that he testified that he was not offering any expert opinion in relation to that property. As for the remaining properties, Neely noted problems with each in his expert report. He did not at that time, however, provide an opinion as to Plaintiffs' alleged damages. Nor did he provide such an opinion during his deposition on May 21, 2010. However, in a supplement to his expert report dated May 24, 2010, Neely indicates that it will cost $11,210.00 to repair the Cory Drive property; $12,112.50 to repair the Stephanie Drive property, and $850.00 to repair the Tower Drive property.[2]

On May 22, 2009, Plaintiffs filed an eight-count complaint in this Court. With respect to the Blackwell Defendants, Plaintiffs alleged breach of contract (Count I), fraud (Count II), breach of warranty (Count III), misrepresentation (Count IV), and negligence (Count V). With respect to DBS, Plaintiffs alleged professional negligence (Count VII). Finally, with respect to both the Blackwell Defendants and DBS, Plaintiffs alleged nuisance, (Count VI) and deceptive trade practice in violation of the Tennessee Consumer Protection Act ("TCPA"), T.C.A. § 47-18-101 *et seq.* (Count VIII). Plaintiffs sought a host of remedies, including rescision, compensatory, treble, and punitive damages, and attorney's fees and pre-judgment interest.

On June 6, 2010, and with leave of Court, Plaintiffs filed an Amended Complaint. The Amended Complaint contained the same allegations as those in the original Complaint, but added that, with respect to the TCPA claim, the Blackwell Defendants' representation that they were

---

[2]Defendants filed motions seeking to prohibit Plaintiffs from using Neely's opinion as to the costs of repair because the disclosure was untimely. Those motions were denied because Defendants suffered no irreparable harm. However, Plaintiffs were ordered to pay the cost of any further deposition of Neely. (Docket Entry No. 81).

6

licensed contractors when they were not violated T.C.A. § 47-18-104(b)(35).[3]

## II. <u>STANDARD OF REVIEW</u>

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U .S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. <u>Id</u>. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986)(quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court must presume that the evidence of the non-moving party is true, and must resolve all doubts and inferences in favor of the non-moving party. <u>Eastman Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and

---

[3]The Blackwell Defendants' Motion for Review of the Magistrate Judge's decision to allow the Complaint to be amended was denied. (Docket Entry No. 80).

7

admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323.

The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." Id..at 248 (citation omitted). Rather, in reviewing cross motions for summary judgment, courts are to "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." Wiley v. United States, 20 F.3d 222, 224 (6th Cir. 1994).

### III. APPLICATION OF LAW

**A. Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 29)**

Plaintiffs move for partial summary judgment against the Blackwell Defendants. They claim that due to those Defendants' alleged fraud," Plaintiffs "are . . . entitled to summary judgment rescinding the sales of the subject properties, awarding judgment in the amount of their respective purchase prices, $3,917,000, and for treble damages, attorney's fees, and pre-judgment interest[.]" (Docket Entry No. 29 at 2). Plaintiffs have failed to show that they are entitled to any of those remedies as a matter of law.

"Rescission, of course, involves the avoidance, or setting aside, of a transaction" and usually "involves a refund of the purchase price or otherwise placing the parties in their prior status." Mills

8

v. Brown, 568 S.W.2d 100, 102 (Tenn. 1978).  Few grounds justify rescission, but fraud is among

those that do.  Healthcare Management Resources, LLC v. Carter, 2007 WL 173907 at *7 (Tenn.

Ct. App. 2007); see also, Vinegard v. Varner, 2003 WL 22794467 at * 2 (Tenn. Ct. App. 2003)("It

is well-settled that the equitable remedy of rescission is an appropriate remedy under the TCPA").

Here, Plaintiffs claim Chris Blackwell's representation to Prince that he was a licensed

contractor constituted fraud, both under the common law and under the TPCA.  However, in seeking

the remedies of rescission, treble damages, attorney's fees and pre-judgment interest, Plaintiffs rely

on the TCPA which states that it is an unfair or deceptive practice to hold oneself out as a licensed

contractor when such person has not been licensed as required by T.C.A. § 62-6-103(a)[4], or to act

in the capacity of a contractor while not licensed.  T.C.A. § 47-18-104(b)(35).  While it is true that

it is unlawful or deceptive under the TCPA to falsely hold oneself out as a licensed contractor, this

does not mean that Plaintiffs necessarily are entitled to the remedies that they seek.

As a preliminary matter, to recover damages under the TCPA, "plaintiff[s] must prove: "(1)

that the defendant[s] engaged in an unfair or deceptive act or practice declared unlawful by the

TCPA and (2) that the defendant[s'] conduct caused an 'ascertainable loss of money or property,

real, personal, or mixed, or any other article, commodity or thing of value wherever situated[.]'"

Tucker v. Sierra Builders, 180 S.W.3d 109, 115 (Tenn. Ct. App.2003)(quoting, T.C.A. §

47-18-109(a)(1)).  In their moving papers, Plaintiffs have failed to establish conclusively the extent

of their alleged damages as a result of the misrepresentation, let alone shown that they are entitled

as a matter of law to the refund of their purchase price.  Instead, they merely assert that the

---

[4]This statute makes it unlawful to engage in the business of residential construction without
a license.

9

properties have "diminished resale value." (Docket Entry No. 31 at 7).

Further, "[t]he equitable remedy of rescission is not enforceable as a matter of right[]." Klosterman Development Corp. v. Outlaw Aircraft, 102 S.W.3d 621, 632 (Tenn. Ct. App. 2002). Rather, "[t]he remedy of rescission is a discretionary matter which should be exercised sparingly and only when the situation demands such." James Cable Partners, L.P. v. City of Jamestown, 818 S.W.2d 338, 343 (Tenn. Ct. App. 1991).

In this case, Plaintiffs have not shown that equity demands rescission, but rather simply assert that because a misrepresentation was made rescission automatically follows. This ignores the fact that "rescission of a contract is not looked upon lightly" and "is available only under the most demanding circumstances." Robinson v. Brooks, 577 S.W.2d 207, 208 (Tenn. Ct. App. 1978).

Also on the issue of rescission, "[c]ourts have long held that the right to rescind a contract for fraud must exercise immediately upon its discovery, and any delay in doing so, and continued employment, use and occupancy of property received under a contract will be deemed an election to confirm it." Cashia v. Hancock, 2002 WL 1466058 at *11 (Tenn. Ct. App. 2002)(citing, Russell v. Zanone, 404 S.W.2d 539, 544 (Tenn. Ct. App. 1966)). In other words, a "'failure to rescind with reasonable promptitude amounts to affirmation of the contract.'" Ingram v. Beazer Homes Corp., 2003 WL 1487251 at *6 (Tenn. Ct. App. 2003)(citation omitted).

Here, the record as it presently exists fails to demonstrate conclusively that Plaintiffs took no actions which were inconsistent with the intent to rescind after they were aware of questions surrounding Chris Blackwell's licensing. All the record establishes at this point is that Plaintiffs were on notice that Chris Blackwell might not have had a contractor's license by July 7, 2008, and they filed suit almost a year later, but did not finally raise the license issue until they filed their

10

Amended Complaint almost two years after the e-mail was received.  While Plaintiffs offer reasons for that, including that they had binding leases with tenants and the complexes served as collateral for loans, the Court cannot say on this record and as a matter of law that Plaintiffs acted without delay in seeking the remedy of rescission.

Plaintiffs have also failed to establish as a matter of law that they are entitled to treble damages.  The TCPA provides that the court may award treble damages if it finds that the unfair or deceptive act was a willful or knowing violation and, in making that determination, the Court may consider the competence of the consumer, the nature of the deception and whether coercion was involved, the damage to the consumer, and the good faith of the person who is alleged to have violated the TCPA.  TCA § 47-18-109(a)(3) & (4).  None of those factors are fully developed on this record, let alone conclusively established by Plaintiffs.

Finally, Plaintiffs have failed to show that they are entitled to attorney's fees or pre-judgment interest.  The TCPA does not mandate an award of fees, but rather indicates that the same *may* be awarded upon a showing of a violation.  TCA §§ 47-18-109(e)(1).  Likewise, T.C.A. § 47-14-123 provides that pre-judgment interest *may* be awarded to a prevailing party.  Both are matters of discretion under the TCPA, Gaston v. Tennessee Farmers Mut. Ins. Co., 2007 WL 1775967 at *6 (Tenn. Ct. App. 2007), but Plaintiffs have failed to show on the present record that the Court should exercise its discretion and award attorney's fees and pre-judgment interest.

Accordingly, Plaintiffs' Motion for Partial Summary Judgment will be denied.

## B.  DBS' Motion for Summary Judgment (Docket Entry No. 37)

DBS moves for summary judgment on all of the claims asserted against it.  Plaintiffs concede that DBS is entitled to summary judgment on their nuisance claim, as well as on Plaintiffs' claims

for professional negligence and breach of the TCPA with respect to all of the properties, except the Cory Drive property.

It is clear DBS is entitled to summary judgment on the nuisance claim because DBS has no control over the property as required by Tennessee law. See, County of Johnson v. U.S. Gypsum Co., 540 F. Supp. 284, 294 (E.D. Tenn. 1984). It is also clear that DBS is entitled to summary judgment with respect to all of the claims involving the Ringgold Court, Stephanie Drive, and Tower Drive properties because Plaintiffs have identified no defects or deficiencies in the design services provided by DBS in relation to those properties.

With respect to the Cory Drive property, DBS points out that for Plaintiffs to prove professional negligence, they must provide expert testimony on the standard of care, see, Martin v. Sizemore, 78 S.W.2d 249, 246 (Tenn. Ct. App. 2001), and that Neely, Plaintiffs' sole expert, testified that his only criticism of DBS' design for the Cory Drive property was that there was no evidence DBS performed hydraulic calculations for the site that considered the effects of the pond which was located on the adjacent property. DBS also argues that Plaintiffs' TCPA claim fails because Prince testified that he was unaware of any misrepresentations by anyone at DBS. In response, Plaintiffs assert that they can maintain both their TCPA and professional negligence claims as to the Cory Drive property because Defendants have not shown they did, in fact, conduct the hydraulic tests and a failure to conduct such tests would be both a breach of the standard of care and a misrepresentation.

The question as to whether hydraulic tests were performed on the Cory Drive property is at the core of the contested issues presented by DBS' Motion for Summary Judgment, but the Court is not in a position to determine the validity of the parties' factual assertions on this question. DBS

has supplied the Affidavit of James Fielder, an employee of DBS and a licensed professional engineer, who affirmatively states that, in accordance with the applicable standard of care, DBS performed hydraulic calculations for the Cory Drive property, and utilized those calculations in preparing the site grading and drainage plans for that property. However, Fielder attaches no such calculations to his affidavit and they do not otherwise appear in the record.

For their part, Plaintiffs characterize Fielder's assertion as self-serving. In their response brief, they also claim that DBS failed to provide any documentation about the hydraulic tests during discovery, despite written discovery from Plaintiffs which requested, among other things, that DBS produce any and all documents related to the design and construction of the properties in question. (Docket Entry No. 65 at 7-9).

Given the present state of the record, it is not clear whether any documentation does or should exist surrounding the taking of hydraulic tests. Plaintiffs suggest that such tests would be memorialized and Neely testified in his deposition that he would need to look at such data in order to determine whether DBS took into account the adjacent pond when it made its design. DBS does not dispute those contentions. Nor does it dispute that such documents were not provided to Plaintiffs, despite a proper request.

Because the Court cannot resolve the dispute about the hydraulic tests based upon the record as it presently exists, the Court will deny DBS' Motion for Summary Judgment insofar as it relates to the Cory Drive property. However, the Court will grant the Motion insofar as it seeks judgment on all of Plaintiffs' claims involving the remaining properties.

**C. The Blackwell Defendants' Motion for Summary Judgment (Docket Entry No. 45)**

The Blackwell Defendants raise an assortment of arguments in support of their position that

13

they are entitled to summary judgment on all of Plaintiffs' claims. The Court considers those arguments in the order presented.

### (1) Tower Drive and Ringgold Drive Properties

The Blackwell Defendants move for summary judgment on all of Plaintiffs' claims in relation to the Tower Drive and Ringgold Drive properties solely on the basis that Neely, in his expert report and deposition, did not identify any defects with those properties. However, in his supplemental report, Neely indicates that curbing and an "inlet control structure" needed to be added at the Tower Drive property (Docket Entry No. 32-3 at 2), which suggests some defect in construction. Moreover, by limiting the evidence to Neely, the Blackwell Defendants wholly ignore the fact that Prince and/or someone else may be able to testify as to problems they witnessed at these properties and any remedial steps taken to rectify any such problems. By limiting the evidence to Neely's testimony and opinions, the Blackwell Defendants also fail to take into account Plaintiffs' position that the properties' values are lower, and the resale potential more problematic, because they were not built by a licensed contractor.[5]

### (2) Cory Drive and Stephanie Drive Properties

The Blackwell Defendants argue they are entitled to summary judgment on Plaintiffs' claims for breach of contract, breach of warranty, negligence and nuisance in regard to the Cory Drive and

---

[5]The Court notes that, in his deposition, Prince was unsure about whether there were any problems at the Ringgold property because he did not "handle the day-to-day stuff" and that he would have to check with "Jackie." (Prince Depo. at 15). While this is certainly not affirmative evidence that there were, in fact, problems at Ringgold Court, the point is that the Blackwell Defendants must prove that they are entitled to summary judgment as a matter of law and they cannot do so by merely relying on Neely's opinion. Moreover, whether or not there were problems identified at the Ringgold Court property does not negate Plaintiffs' assertion that all of the properties (including Ringgold Court) are worth less given the Blackwell Defendants' unlicensed status.

Stephanie Drive properties. In doing so, the Blackwell Defendants assert that the only defect with those properties that Neely identified in his expert report and deposition was inadequate vegetation, and Plaintiffs inspected the properties prior to closing and accepted the properties "as-is." There are several reasons why such assertions are insufficient to establish that the Blackwell Defendants are entitled to summary judgment in relation to the Cory and Stephanie Drive properties.

First, and as has just been noted, Plaintiffs' case need not be proven solely through the testimony of Neely. Prince and/or others with knowledge can testify as to what they observed.

Second, the Court does not read Neely's expert report as narrowly as the Blackwell Defendants. While Neely expresses concerns about inadequate vegetation in his deposition and expert report, he also states in his expert report that there a "number of issues surrounding the Cory Drive complex that are in need of attention to address the localized flooding potential," including, but not limited to, insufficient consideration of off-site drainage which has only been partially addressed; the fact that "finish floor elevations of the structures were built significantly lower than originally designed"; the possibility that a retaining wall might need to be built; and potentially inadequate ditch grades. (Docket Entry No. 32-1 at 12). As for the Stephanie Drive property, Neely states that the primary issues "center around the steep slope along the western and southern boundaries . . . and the flooding potential of adjacent buildings. (Id.). He notes that there was a discrepancy between the slope as designed and the slope as built, with the toe of the slope being apparently too close to the adjacent structure to satisfactorily control run-off. There are other concerns about both properties expressed by Neely, but the foregoing examples suffice to show that vegetation is not the only problem identified.

Third, the fact that Plaintiffs accepted the property "as-is" does not automatically absolve the

Blackwell Defendants. The Blackwell Defendants were required to build and deliver a workmanlike structure free from major defects and built in a workmanlike manner. Dixon v. Mountain City Const. Co., 632 S.W.2d 538, 541-42 (Tenn. 1982). They were also required to construct the complexes in accordance with proper designs and with due consideration to grading and drainage. See, Redbud Coop. v. Clayton, 700 S.W.2d 551, 559 (Tenn. Ct. App. 1985). Under the Purchase Agreements, Plaintiffs were only supposed to inspect for "structural defects, interior water intrusion(s), standing water within foundation and/or basement, and the roof and decking for visible leaks." The Blackwell Defendants do not explain how Plaintiffs were supposed to realize that the property was built below the specified grade, that the drainage was allegedly inadequate or not built to plan, or that the vegetation (which at the time of closing was merely grass seed) was insufficient to serve its intended purpose. See, Briggs v. Riversound Ltd. Ptsp., 942 S.W.2d 529, 531 (Tenn. Ct. App. 1996)(action lies against builder for defects which cause damage where those defects are latent and not known or reasonably discoverable by purchaser).

### (3) Fraud and Misrepresentation Claims

The Blackwell Defendants move for summary judgment on Plaintiffs' fraud and misrepresentation claims, arguing that Plaintiffs have "no evidence" to support such claims. In support, the Blackwell Defendants again rely on Neely's deposition testimony, specifically his testimony that he had "no data that suggest that there would be anything hidden or covered up" and the he had "no personal knowledge or professional knowledge of those." (Docket Entry No. 54 at 19, citing Neely Depo. at 97).

The elements of a common law fraud claim are: (1) an intentional misrepresentation of a past or existing material fact, (2) knowledge of the representation's falsity; and (3) injury caused by

16

reasonable reliance on the representation. See, First Nat'l Bank v. Brooks Farms, 821 S.W.2d 925, 927 (Tenn. 1991). Similarly, "[t]o succeed on a negligent misrepresentation claim, a plaintiff must establish that: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs justifiably relied on the information." Stanfill v. Mountain, 301 S.W.3d 179, 189 (Tenn. 2000). In addition to the elements required to prove negligent misrepresentation, an intentional misrepresentation claim requires proving an additional element, which is that "the false representation [must be made] either knowingly or without belief in its truth or recklessly [with regard to its truth]." Metropolitan Gov't v. McKinney, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992).

The Blackwell Defendants' argument that they are entitled to summary judgment on Plaintiffs' fraud and misrepresentation claims fails from the start because the Blackwell Defendants do not consider Prince's statement and Chris Blackwell's admission that the latter told Prince he was a licensed contractor when in fact he was not, or Prince's assertion that he relied upon those representations, at least with respect to the last three properties Plaintiffs' purchased.

Further, and at least in relation to the fraud claim, Plaintiffs also assert that the Blackwell Defendants failed to tell them about water problems of which they should have reasonably known and in support note that, just months after construction, moderate rain led to severe water problems. A logical inference, they insist, is that such problems were no doubt noticeable during the period it took to construct the building. The Blackwell Defendants counter that any such allegation fails because Chris Blackwell in his deposition testified he "was unaware of any water issues on the properties prior to or at the time of closing." (Docket Entry No. 61-4 at 4).

Actually, while Chris Blackwell testified at one point in his deposition that he did not notice

17

any water issues while he was building the apartments, at another point he testified that he did not recall such a problem and that it was "[t]oo long ago." (C. Blackwell Depo., pp. 28 & 50-51). In any event, Chris Blackwell's deposition testimony is arguably self-serving and says nothing about what William Blackwell (or anyone else working for Blackwell Construction) knew.

A statement which is "arguably self-serving, is not 'no evidence.'" Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 300 (6th Cir. 2008). But, self-serving statements that are without objective corroboration are "not significantly probative," Shaw v. Danley, 2000 WL 64945 at *7 (6th Cir. 2000), and, even less so where, as here, the statements are not unequivocal. Obviously, what the Blackwell Defendants truly knew is open to question and "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are for the factfinder to determine and not for the judge to decide on summary judgment. Anderson, 477 U.S. at 255.[6]

### (4) TCPA and Hidden Defect

The Blackwell Defendants move for summary judgment on the TCPA claim because the TCPA "imposes no liability where the seller had no knowledge of hidden defect and where an inspection by the purchaser would reveal the same information known by the seller." (Docket Entry No. 54 at 22). In support of that position, the Blackwell Defendants rely on Ganzevoort v. Russell,

_____

[6]In concluding that the Blackwell Defendants have not established as a fact that they were unaware of any water problems prior to Plaintiffs' possession, the Court recognizes that Plaintiffs have failed to put forth much in the way of evidence to support the contention that the Blackwell Defendants reasonably should have been aware of water issues by the time of closing. However, because the Blackwell Defendants are not entitled to summary judgment on the fraud claim involving Chris Blackwell's misrepresentation about his status, because fraud claims rarely involve direct evidence but are usually based upon circumstantial evidence, because Plaintiffs are entitled to all reasonable inferences, and because this case will be tried to the bench, the Court will not dismiss this discrete subset of the fraud claim at this time.

18

848 S.W.2d 293, 299 (Tenn. 1997) and Ingram v. Cendant Mobility Finan. Corp., 215 S.W.3d 367 (Tenn. Ct. App. 2006).

This Court has already determined that the defects about which Plaintiffs complain, *e.g.* the property was built below the specified grade, and the drainage was inadequate, would not appear to be readily discoverable upon inspection. While both Ganzevoort and Ingram dealt with hidden defects and the TCPA, they did so in an entirely different context.

Ganzevoort involved a realtor who undertook to bring the subject house within F.H.A. requirements and hired an F.H.A. inspector to reach that goal. Unfortunately, the inspector did not discover that portions of the floor hidden under carpet and tile were water damaged. Under these circumstances, the Tennessee Supreme Court held that the realtor could not be liable for unfair and deceptive trade practices under the TCPA.

Similarly, Ingram involved a claim against a seller who relied upon an inspection and earlier owners' disclosures in selling a home. The Tennessee Court of Appeals held that because the seller's knowledge about the home came exclusively from others, the seller could not be liable under the TCPA for moisture problems which were not apparent.

This case is different because it does not involve merely a seller, but rather a seller who is also the builder. As already indicated, the Blackwell Defendants, as builders, were required to deliver the complexes free from major defects and in accordance with proper plans. Unlike the sellers in Ganzevoort and Ingram, the Blackwell Defendants had possession and control and they did not rely exclusively on others in making any representations. Moreover, in both Ganzevoort and Ingram, the claims were brought under the "catch-all" provision of the TCPA which prohibits "engaging in any . . . act or practice which is deceptive to the consumer or to any other person," T.C.A. § 47-18-

104(b)(27), whereas here Plaintiffs bring TCPA claims not only under that general provision, but also under the specific provision found in T.C.A. 47-18-104(b) which makes it a deceptive practice to act as a duly licensed contractor when one is not so licensed.

### (5) Damages

The Blackwell Defendants next move for summary judgment on all of Plaintiffs' claims because they purportedly cannot show any damages. As support, they point out that in his deposition and initial expert report, Neely did not express any opinion as to damages. However, this Court has already ruled that Neely's supplemental report would be considered and, in that report, Neely lists the costs to repair or replace numerous allegedly defective or deficient items.

Moreover, one of Plaintiffs' claims is that all of the properties' values are less because they were built by an unlicensed contractor. That claim is supported by Prince's Second Declaration wherein he states he is a professional real estate investor, he has bought and sold numerous properties all over the United States, he has bought and sold more than 50 residential and commercial properties in Tennessee alone, and, based on his experience, he believes the properties are worth 30% to 50% less than their purchase price because of the fact that they were built by an unlicensed contractor and the fact that they are prone to water issues.[7]

### (6) Licensing Issue Claims

Finally, the Blackwell Defendants move for summary judgment on Plaintiffs' fraud and TCPA claims insofar as they relate to the licensing issue. They argue it would be inequitable to allow Plaintiffs to pursue this claim given its late filing and raise numerous arguments in support thereof.

---

[7]The Blackwell Defendants claim that Prince is not a declared expert in this case and therefore he cannot testify as to the alleged diminution in property value. That argument is discussed in the next section of this Memorandum.

(i) <u>Waiver and Laches</u>

Waiver and laches are equitable defenses to the enforcement of a contract.  <u>McGregor v.</u>
<u>Christian Care Center</u>, 2010 WL 1730131 at *5 (Tenn. Ct. App. 2010). Waiver is the voluntary
relinquishment of a known right which may be shown either by express declaration or by action or
conduct evidencing an intent not to exercise the right.  <u>Reed v. Washington County Bd. of Educ.</u>, 756
S.W.2d 250, 255 (Tenn. 1988). "[L]aches is an old and well-established principle of equity that
allows a court not to enforce a stale demand where a party has slept upon his or her rights for an
unreasonably long time." <u>Austin v. Austin</u>, 2010 WL 877518 at *8 (Tenn. Ct. App. 2010). "[T]he
application of the doctrine lies within the discretion of the trial court," with the primary focus being
not on "the length of time that has elapsed . . . but rather whether the party relying on laches as a
defense has been prejudiced by the delay." <u>Id</u>.  In this regard, "the death of witnesses or the loss of
evidence is the sort of prejudice that, coupled with an unreasonable delay, amount to laches." <u>Brown</u>
<u>v. Ogle</u>, 46 S.W.3d 721, 728 (Tenn. Ct. App. 2000)(collecting cases).

Here, while there was a two year delay between when Plaintiffs should have been placed on
notice that Chris Blackwell was probably not licensed as a contractor, that delay was not necessarily
inordinate.  The primary relief which Plaintiffs seek on this claim is rescission and rescission was
requested in the original Complaint.  Moreover, and has already been indicated with respect to
Plaintiffs' Motion for Partial Summary Judgment, the Court cannot say, as a matter of law whether
Plaintiffs took actions which amounted to a voluntary relinquishment of their claim because, as they
explain, rescission would be problematic given that they had binding leases with tenants and the
properties served as collateral for loans.

Additionally, the Blackwell Defendants have not established any significant prejudice.  They

knew from the filing of the initial Complaint that Plaintiffs were seeking rescission, they at least touched upon the licensing issue when they deposed Prince before the filing of the Amended Complaint, and they knew from the very beginning that Chris Blackwell was not a licensed contractor. This is simply not a case where the Blackwells can claim utter surprise.

(ii) <u>Statute of Limitations</u>

The Blackwell Defendants next argue that the license claim is barred by the one-year statute of limitations for a TCPA claim. They assert that Plaintiffs should have been aware of the issue by virtue of the July 30, 2008 e-mail and that, while the original Complaint was filed within a year thereafter, the Amended Complaint which added the licensing claim was not filed until June 4, 2010.

Rule 15 provides that an amendment relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading," and when "the law provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1). Where the claim arises out of the same conduct or occurrence, claims under the TCPA relate back to the filing of the original complaint. <u>See</u>, <u>Crowie v. State Farm Fire & Cas. Co.</u>, 2007 WL 2238271 at *8 (E.D. Tenn. 2007); <u>Solomon v. Hager</u>, 2001 WL 1657214 at 13 (Tenn. Ct. App. 2001).

Here, Plaintiffs' claim that the Blackwell Defendants' actions violated T.C.A. § 47-18-104(b) indisputably arises out of the same conduct or transaction set forth in the original Complaint, to wit, the building of the apartment complexes. Further, the original Complaint filed in this case alleged unfair and deceptive trade practices in violation of the TCPA generally, and the Amended Complaint merely further honed the claim to include Chris Blackwell's misrepresentation as being in violation of T.C.A. § 47-18-104(b).

22

(iii) <u>Damages</u>

The Blackwell Defendants also argue they are entitled to summary judgment on the licensing issue because Plaintiff cannot show any damages. Again they point specifically to Neely's initial expert report and deposition testimony. As already noted Plaintiffs have supplied a declaration from Prince wherein he establishes at least some basis for damages on the licensing issue claim – loss of property value.

In a footnote in their reply brief, and without citation to authority, the Blackwell Defendants argue that Princes' opinion about lost value amounts to expert testimony and, since he was not identified as an expert, the same is inadmissible. (Docket Entry No. 74 pp. 6-7, n.3). However, persons engaged in business can, by virtue of their experience, testify as to expected losses even if the subject matter is specialized or technical because the testimony is based upon personal knowledge. <u>See</u>, <u>Donlin v. Phillips Lighting North Am. Corp.</u>, 581 F.3d 73, 81 (3d Cir. 2009)(collecting cases). It is within the discretion of the trial court whether to allow owners or officers of a business to testify as to diminished-value damages, <u>Lativafter Liquidating Trust v. Clear Channel Comm. Inc.</u>, 345 Fed. Appx. 46, 61 (6th Cir. 2009), and whether Prince can testify as to loss value is something the Court will consider at trial.

(iv) <u>Rescission as Remedy</u>

For two reasons, the Blackwell Defendants assert that Plaintiffs are not entitled to rescission based upon their TCPA claim. First, the Blackwell Defendants assert that Plaintiffs did not elect to pursue their remedy of rescission promptly. This Court has already discussed that issue in the context of Plaintiffs' Motion for Partial Summary Judgment and found that issues of fact exist as to whether, given all the circumstances, Plaintiffs acted in a manner which could be deemed to be inconsistent

23

with an intent to rescind.

Second, the Blackwell Defendants argue that because the alleged defects in the properties can be fixed, rescission is not appropriate. Even if the defects can be remedied, such remedial measures would not address the fact that the properties were built by a contractor who was unlicensed at the time, or negate Plaintiffs' assertion that the properties are worth significantly less because of that fact.

In light of the foregoing, the Blackwell Defendants' Motion for Summary Judgment will be denied.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 29) will be denied. The Motion for Summary Judgment filed by DBS will be granted with respect to all claims relating to the Tower Drive, Stephanie Drive and Ringgold Court properties, but denied with respect to Plaintiffs' TCPA and professional negligence claims involving the Cory Drive property. Finally, the Blackwell Defendants' Motion for Summary Judgment (Docket Entry No. 45) will be denied.

Thomas A. Wiseman, Jr.
Senior United States District Judge